[Decided February 2, 1888.]

NORTHERN PACIFIC RAILROAD COMPANY v. JAMES HOLMES.

3w543
4    40
18⁕ 76
29⁕ 943

1. RAILROAD COMPANIES—ACCIDENTS AT CROSSING — CONTRIBUTORY NEGLIGENCE—NONSUIT.—In an action against a railroad company for injuries caused by a switching train striking plaintiff as he, with a team, was driving across the railroad track, on the only road leading from one part of the town of Sprague to the other, the evidence showed that plaintiff, so far as he could see the train, his view being partly obstructed by the cars, saw it moving away from the crossing; that the engine bell was not ringing continuously; that the switching train was passing back and forth, over this crossing, almost continuously, and that plaintiff, after coming with fifteen feet of the track, could not have stopped his team: *Held*, that plaintiff's failure to stop, look, and listen, did not, in itself, constitute such contributory negligence as would justify taking the case from the jury.

2. TRIAL—INSTRUCTIONS—PREPONDERANCE OF EVIDENCE—WITNESSES.—After a charge that the "preponderance of evidence in a case is not alone determined by the number of witnesses testifying to a particular fact or statement," and that the jury should consider the "opportunities of witnesses for seeing or knowing the particular things about which they testify; their conduct and demeanor; their interest or lack of interest in the suit; the probability or improbability of the truth of their statements," it is not error for the court to add in its instruction that "if, however, the witnesses who testify differently to the same fact are all of equal candor, fairness, intelligence, and truthfulness, and equally well corroborated by all the other evidence, and are upon an equal footing as to interest in the result of the suit, then the preponderance of evidence as to that fact would be determined by the number of witnesses," especially when the greater number of witnesses were on the side of the party complaining of the instruction.

ERROR to the District Court holding terms at Spokane Falls. Fourth District.

This is an action by James Holmes against the Northern Pacific Railroad Company, to recover damages for personal injuries sustained by reason of the negligence of the latter and its employes. The plaintiff recovered judgment, from which defendant appealed. The appeal was decided by the Supreme Court at a former term (February 4, 1887), and resulted in a reversal of the judgment, and an order was made remanding the cause, with directions to grant the defendant's motion for a nonsuit. (See *ante*, 202.) A petition for rehearing was filed, which was granted at the special July term, 1887, and the cause was reargued. All the necessary facts appear, with points of counsel, in the former report of this cause above referred to and in the present opinion of this court.

*Messrs. McNaught & Mitchell*, for the Plaintiff in Error.

*Mr. W. R. Andrews*, and *Mr. John B. Allen*, for the Defendant in Error.

Mr. Justice ALLYN delivered the opinion of the court.

The appellee filed his complaint in the District Court at Cheney, in February, 1884, averring negligence of the appellant in running a train over B-street crossing, in the

town of Sprague, rapidly, without warning, and in maintaining a freight depot adjacent to B street, and in leaving a line of freight cars partly abutting on said crossing, thereby obstructing the view of those using said street.

That when appellee was approaching said crossing, his view being obstructed by the depot and cars stationed as above, his buggy collided with this moving train, and appellee was injured, etc.

Appellant admits the location of the depot and cars, denying negligence; admits the moving of the train which occasioned the injury, but denies that it was running rapidly or without warning; and affirmatively avers negligence of the appellee contributing to the injury.

There was a trial and verdict rendered, which the court set aside. A second trial was had, and a verdict rendered for $10,000, which is now being reviewed. The case having been brought to the Supreme Court, at the January term, 1886, the judgment of the court below was reversed, for the reason stated by the majority of the court, that it clearly appeared from the evidence that the plaintiff, in driving upon the railroad track without stopping and going forward to look and listen, had been guilty of contributory negligence, and that the lower court ought, on that ground, to have granted the motion of the defendant for a nonsuit. A petition for rehearing having been granted, the cause has been again presented to this court.

The principal discussion has turned upon what we may designate as three main questions. Appellant claims:

1. That the evidence showed contributory negligence on the part of appellee to such an extent that it became a question of law for the court; and in the refusal of the court to determine this question, and in submitting it to the jury, there was error.

2. That instruction given (number 13 of appellant's brief), relating to the preponderance of the evidence, is error.

3. That instruction given (number 14 of appellant's brief), relating to appellee's ability and opportunity to see and judge, was also error.

There are very many other errors assigned, but practically all of the long and exhaustive presentation of this case has been made to turn upon what are called the three main questions, as above.

The appellee testified that when approaching this crossing he saw the train disappear, going away from the crossing, and then drove on slowly, his view being obstructed by cars standing on a side track, by the depot, etc., and that he was driving a reliable pair of horses, and carefully. There was evidence that two other teams, coming from the opposite direction, whose drivers had full view of such departing train, started across the same crossing; these teams and appellee meeting not far from the track of the standing cars. It was in evidence that the yardman, or switchman, was but a short distance, signaling such moving train, and it is evident he saw, or readily could have seen, all these teams, including that of appellee, as the latter approached the track on which such train was moving. There was a strong conflict of evidence as to the ringing of the bell, the rate at which the train was moving, and in fact as to many of the material questions.

The jury found a general verdict for appellee, and at the request of appellant, and by direction of the court, returned a large number of special findings (forty-seven) upon particular questions of fact submitted to them in writing, which questions and answers thereto are as follows:

1. Had the plaintiff a knowledge of the crossing where the collision occurred? A.—Yes.

2. Did the plaintiff know at the time of said collision, and prior thereto, that said crossing was within the switching yard of defendant? A.—Yes.

3. If said crossing was within the switch yard of the defendant, was the plaintiff in the habit of crossing at the point where the collision occurred at and prior thereto? A.—Yes.

4. Did the plaintiff know at and prior to the collision that the defendant was in the habit of using said place of crossing, and to the west of the same, in the conduct of its business, and run its trains to and fro over the same? A.—Yes.

5. How many times a day did the trains, including switching trains, of the defendant pass over the crossing where the collision occurred? A.—An indefinite number of times.

6. At what point was the west end of the west box car on the side track, adjoining the depot building, at the time of the collision? A.—Infringed on plank crossing two to five feet.

7. How many box cars were on the side track adjacent to the freight house? A.—Three.

10. For what purpose was the building called freight depot used at the time of the collision? A.—Receiving and discharging freight.

11. Was it clear or cloudy on the day the collision occurred? A.—Clear day.

12. Was it calm, windy, or boisterous on the day of the collision? A.—A little breeze.

13. At what distance from the place where the collision occurred could the noise of the train be heard, if the bell was not rung? A.—From fifty feet to two hundred feet, in our judgment.

14. Did the noise of the train, and wagon of Fish and Breslau, and plaintiff's own vehicle, interfere with plaintiff's hearing the bell, if any bell was sounded? A.—Yes, we think it would.

15. Did the noise of the said wagons and teams interfere with the hearing of the rumbling of the train with which he collided? A.—Yes, we think it did.

16. At what distance from the place where the collision occurred could the plaintiff have heard the rumbling of the moving train, if he had stopped and listened, after the wagons of Fish and Breslau had passed over the crossing? A.—We judge, from one hundred to four hundred feet.

17. Had the plaintiff stopped and listened, at the point where he said he listened, could he have heard the ringing of the bell, if any bell had been sounded, notwithstanding the noise of the team crossing said track immediately prior to the collision? A.—He could.

18. At what rate of speed was the train which collided

with the plaintiff's vehicle, prior to and at the time of said collision, moving? A.—Between six and ten miles an hour.

23. How far east of the place where the collision occurred is the point where the train stopped, whilst going east, reversed, and commenced running back toward the place where the collision occurred? A.—One hundred and forty feet east.

24. At what rate of speed was said train running at the time of said collision? A.—At about six miles an hour.

26. How many drinks of whisky had the plaintiff taken the day of and before the collision, and was the plaintiff at all affected by the whisky he had taken at the time of the accident? A.—Five or six drinks during the day; we have no evidence to show that he was affected.

27. Did the plaintiff, or not, when sixteen feet from the track, at the crossing on which the colliding train ran, have an opportunity of seeing the approaching train; if so, was the view free and complete or partial? State how much of the train he could see at that distance. A.—Yes; a partial view; could see one-quarter of the caboose.

28. Could the plaintiff, or not, have stopped fifteen feet from the track, at the crossing on which the colliding train was moving, and by so stopping avoid the collision? A.— He could not, to the best of our judgment.

30. Had the plaintiff looked in the direction which the train that collided with his carriage came, when within forty feet of the place where the collision occurred, could he have seen the approaching train, if the train was then approaching, if said train was within a distance of seventy feet of said crossing? A.—No.

31. Could the plaintiff, when he was at a distance of fifty feet from the place where the collision occurred, have seen the approaching train, if it was then approaching, if it was at any place within eighty feet of the place said collision occurred? A.—We think he could not, before the filling in of said street.

33. Was the plaintiff, as he was approaching the place where the collision occurred, warned of the approaching

train; if so, by whom? If he was so warned, did he hear the warning? A.—Yes, by Fish and Peterson; we think he did not hear the warning.

34. Had the plaintiff been exercising reasonable caution and care, in approaching the crossing, would he have heard what Fish and Peterson said to him? A.—Under the circumstances, we think not.

35. Did the plaintiff know that the train with which his carriage subsequently collided, previous to the collision, had passed to the east from the place where the collision occurred? A.—Yes.

36. Did he know that this train, with which the collision occurred, was a switching train, or was it his impression that the train he had seen first move toward the east was a switching train? A.—We think it was his impression that it was a switching train.

38. Could the plaintiff have avoided the collision by stopping to listen? A.—Yes, if he had stopped at a safe distance.

39. Was the bell ringing, at the time the train was backing down towards the crossing, continuously and at the time of the collision? A.—We believe, from the evidence, it was not ringing continuously while backing down or at the time of collision.

40. Did the yardmaster, or any one else, just prior to the collision, make any motion at the train when the plaintiff was approaching the place where the collision occurred; and, if so, where was such person standing, and was there anything to prevent the plaintiff seeing said motion, and, if so, what? A.—The person standing at the switch did make motions for the train to back down; there was nothing to obstruct the view of plaintiff from seeing those motions.

41. Did the plaintiff see said motions, and, if he did not, if he had been exercising reasonable care and caution, could he have seen said motions? A.—He did not, we think; he may have been using reasonable care and judgment and still not have seen the motions.

42. Did the plaintiff Holmes, at the time he was approach-

ing said place where said collision occurred, have reason to expect that the switch of any train might pass over the crossing where the collision occurred at any moment? A.—At the time he approached the crossing, and seeing the train going east, he had no reason to suppose it would return soon.

43. At what rate of speed was Holmes' team traveling, as he approached the place where the collision occurred, while his horses were trotting? A.—About five miles an hour.

44. At what rate of speed was Holmes' team traveling, as he approached the place where the collision occurred, while his horses were walking, and what distance did said horses walk? A.—At the rate of four miles an hour; his horses walked about twenty-five or thirty feet.

45. Did the plaintiff stop his team shortly after reaching the place where the collision occurred; if so, at what distance from said place, and for what length of time, if plaintiff did not stop his team, did he check his team and slow up before reaching the place of the collision? A.—No, he did not stop his team; yes, we think he did slow up his team.

46. If the crossing at which the collision occurred was within the switching yard of the defendant, was the said crossing a public highway? A.—Yes, it was.

47. When the plaintiff was at a point one hundred feet from the crossing where the collision occurred, for what space between said point and said crossing was the view of said train obstructed? A.—Judging from our own observation, since the grading or fill in the street, since the time of accident, we think there was a space of twenty or twenty-five feet that the plaintiff could not have seen the train after it had passed east over the crossing; that space was at a point about forty-five to fifty feet from the place of accident, north of crossing.

These special findings, or special verdicts, would sustain the general verdict fully, unless it be number 17, which finds, in substance, that plaintiff could have heard the bell, had one been sounded, if he had stopped and listened; and

upon this proposition, which raises the same question involved in the motion for a nonsuit, the principal argument is made. It is contended, in this case, that "the failure of appellee to *stop, look,* and *listen* was, of itself, contributory negligence," which justified the taking of the case from the jury.

That there are cases where this rule will apply, and where, if these three things are not done, the party will so clearly contribute to his injury, is beyond question. Many of the cases presented are those of regular trains, of the arrival of which the complaining party is properly charged with notice, and must give way to, knowing the time of their being due; such trains having the absolute right of way as against any one crossing the track. It is said this rule will apply to a switch train, and that *it* is always on time, and thus *always has the right of way.* This is impracticable. If this proposition is true, then the traveler has no rights, but the switch train may run backwards and forwards, across streets and crossings, regardless of the life or safety of human beings, for it is "always on time," as appellant argues, and, *ergo,* "always has the absolute right of way."

In this case the appellee, so far as he could see the train, saw it going away *from* him, as he approached the track (with his view obstructed by the acts of the appellant.) He had no reason to expect this departing train to be backed down upon him in the short distance he had to go, and without warning, for, in answer to question 39, the jury find *"the bell was not ringing continuously,"* unless the statement that a switch train always has the absolute right of way is sound, which we cannot concede.

That it may, or may not, be a party's duty to "stop, look, and listen," is dependent on the status of each case; it does not apply to such a case as this; we have very grave doubts if it would have changed the result had the appellee done this, or tried to, as from the finding of the jury (number 28) he could not have stopped in less than fifteen feet; and as this switch train was almost continuously passing and repassing, he had to rely on the appearance of safety and

go ahead. The railroad company had left but one mode of passing from one part of the town to the other; had partially blockaded that; had forced the inhabitants to take the risk of some danger, perhaps, or remain isolated from their neighbors and business. This dangerous condition of things, brought about by the railroad company, we are agreed was wholly inexcusable, and we do not see but that the appellee acted as a reasonably prudent man would act in the light of all the surroundings, and was not guilty of negligence contributing to the injury.

In *R. R. Co.* v. *Houston*, 95 U. S. 697, the party was a trespasser upon the right of way of the company, was walking upon the track, and, by merely looking, or the least effort, might have avoided the injury.

In *Scofield* v. *C. M. & St. P. R. R. Co.*, 2 McCrary, 268, the parties drove on a road parallel to the track and near to it, with a perfectly clear and unobstructed view, and then, with the view of the track open to them for a long distance, deliberately drove upon the track. There is not the least possible similarity between such cases as these and the case at bar. They afford no argument whatever in this case; the same criticisms can be applied to all, or nearly all, of the immense number of cases to which we are cited by appellant. What we have said above is fully supported by the case of *Continental Improvement Co.* v. *Stead*, 95 U. S. 161.

The court very properly left the question to the jury, and to have done otherwise would have been equivalent to saying that the aid of a jury was not necessary to setttle any disputed question of fact.

The next error claimed is the one we above referred to as the second of the three main points involved, and presents for consideration the following instruction given to the jury:

"If, however, the witnesses who testify differently to the same facts are all of them of equal candor, fairness, intelligence, and truthfulness, and equally well corroborated by all the other evidence, and are upon an equal footing as to

interest in the result of the suit, then the preponderance of evidence as to that fact would be determined by the number of witnesses.''

That this instruction, presented as an abstract proposition, might be error, may be conceded, and yet we do not believe any intelligent man could be misled by it. The very purpose for which a jury is called is to "weigh" the testimony of the witnesses; they know this, they are engaged in doing it all through the trial, and fully understand it. This instruction could not mislead, unless the jury might understand from it that they need not test the knowledge and means of knowledge, the credibility, etc., of the witnesses; in other words, that they need not weigh the evidence. It seems almost as strained to claim the inference asked for this instruction by appellant as it would be to say the jury might infer they need not weigh the evidence, or need not try the case. We do not believe that any such impression was created by it; moreover, this instruction was not presented as an abstract proposition. Very long instructions were given—all as one when given—(they were all numbered later). It was one consecutive statement of the propositions involved, given in narrative form, each consecutively following the other; and all could only be read or taken as a whole. Immediately preceding this alleged faulty proposition, and practically a part of it, the court instructed the jury that the "preponderance of evidence in a case is not alone determined by the number of witnesses testifying to a particular fact or statement of facts," and that the jury should take into consideration the "opportunities for seeing or knowing the particular things about which they testify; their conduct and demeanor; their interest or lack of interest in the result; the probability or improbability of the truth of their statements."

Then follows the proposition stated as complained of, which practically told the jury that the term "preponderance" meant the greater number, when it is considered with what preceded it, and as it must have been read. And, finally, if the above is not sufficient, we may add that if the words

"greater number" could have worked injury, it was one of which appellant cannot be heard to complain, as a careful examination of the record will disclose the "greater number" were on the side of appellant.

The next objection, being the last of what we have termed the three main questions, is to the following instruction given by the court: "If at any time before plaintiff put himself across the track of the approaching train he was in a position that he could have seen the train moving towards the crossing *well enough* to understand its movements," etc. The words "well enough" are objected to, but we fail to appreciate the objection. Objection is made to nearly all that was done, and at every stage of the proceedings. We have not time to comment on all this, but it is sufficient to say we have carefully examined them and endeavored to give to them all that consideration which a case of this magnitude and importance demands.

We concur in the action of the court below, and feel that it is fully sustained by the record. The judgment of the court below is affirmed.

LANGFORD, J., concurred.
JONES, C. J., dissented.